# IN THE COURT OF APPEALS OF IOWA

No. 17-0474
Filed May 2, 2018

**DERRICK STEVEN PENA,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Scott County, Thomas G. Reidel, Judge.

The applicant appeals from the denial of his application for postconviction relief. **AFFIRMED.**

Zeke R. McCartney of Reynolds & Kenline, L.L.P., Dubuque, for appellant.

Thomas J. Miller, Attorney General, and Benjamin M. Parrott, Assistant Attorney General, for appellee State.

Heard by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**POTTERFIELD, Judge.**

Derrick Pena appeals from the denial of his application for postconviction relief (PCR) following his 2011 convictions for robbery in the first degree, burglary in the first degree, and willful injury causing serious injury. Pena claims trial counsel provided ineffective assistance in a number of ways: (1) failing to inform him of his right to testify or to advise him he should do so; (2) failing to properly investigate and prepare the case; (3) failing to object to testimony regarding statements Pena made about robberies in the area prior to the incident; (4) failing to advise him of his plea options; and (5) failing to make a *Batson* challenge[1] when the prosecution struck one of two minority potential jurors. Pena also claims direct appeal counsel provided ineffective assistance by failing to challenge the district court's denial of his motion for new trial on direct appeal.

**I. Prior Proceedings.**

In March 2011, Pena was charged with burglary in the first degree, robbery in the first degree, conspiracy to commit a forcible felony, willful injury causing serious injury, and assault while participating in a felony resulting in serious injury. Following a jury trial later that year, Pena was convicted of each of the five charges.

At sentencing, the district court determined Pena's convictions for conspiracy to commit a forcible felony and assault while participating in a felony resulting in serious injury merged into other offenses. The court then sentenced Pena on the three remaining charges. The court ordered Pena to serve a twenty-five year sentence for both the burglary conviction and the robbery conviction;

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

Pena was sentenced to a five-year term for the willful-injury conviction. The court ordered the sentences to be served concurrently.

Pena filed a direct appeal, in which he challenged the district court's denial of his motion for judgment of acquittal and argued trial counsel had provided ineffective assistance by not seeking to sever Pena's trial from that of his co-defendant. After hearing oral argument on the matter, a panel of this court affirmed Pena's conviction, with one judge dissenting on the issue of sufficiency of the evidence. *See State v. Pena*, 12-0082, 2013 WL 5745608, at *4 (Iowa Ct. App. Oct. 23, 2013).

Pena filed his first application for PCR in August 2015 before later filing two amended applications. When the matter initially came on for hearing, in October 2016, Pena had seventeen claims to be adjudicated by the PCR court. After a second day of hearing—in February 2017—the PCR court issued a written ruling finding Pena had failed to establish that he was entitled to relief on any of his claims.

Pena appeals.

**II. Underlying Facts.**

The following is our recitation of facts from Pena's direct appeal:

On January 17, 2011, at 10:00 p.m., three men broke into a residence occupied by four residents, including Nikolas Bender. Bender had been selling powder cocaine from the residence since November 2010. He had sold to five different customers, but only two of those customers, one of which was Pena, were allowed to pick up drugs at the residence. Those two customers would knock at the back door and be taken by Bender to his basement bedroom where he kept the drugs in a safe. Strangers usually used the front door, and only friends and the drug buyers used the back door. Bender

had retrieved drugs from the safe in Pena's presence a couple of weeks before the break-in.

At about 3:00 p.m. on the day of the break-in, Pena had contacted Bender about purchasing a large amount of powder cocaine, and they had agreed on a sale of the amount specified for $700. Pena said he would get back to Bender later in the evening. Pena's prior purchases had been for smaller amounts in the forty-to-seventy dollar price range. About two weeks prior to the purchase Pena's girlfriend overheard a conversation between Pena and another male that mentioned the Bender residence. When she asked what was going on he said they "would be in a lot of money soon." Also, two-to-four weeks prior to the incident Pena told other occupants of the residence that they should be careful that "in this neck of the woods people get robbed every day."

Eventually all of the perpetrators donned face coverings of some sort. Initially one of them, Bobby Thompson, was not masked and was recognized by Bender. On the date of the break-in, Pena and Thompson spoke by telephone twelve times in the hours before the robbery, none during the time frame of the actual break-in, and eight times in the three hours after the robbery. They had communicated by telephone seven times on January 14 and January 16.

Thompson initiated the entry by approaching the back door of the residence and asking Bender if he could use his telephone. Thompson was accompanied by two others, one of [whom] was subsequently identified as Albert Butler. Neither Thompson nor Butler had ever been to the residence previously. Bender noticed that one of the two men accompanying Thompson had a gun. He retreated into the residence, but the perpetrators were able to keep the door from closing and made entry into the premises. The residents handed over wallets and telephones at the demand of the perpetrators to empty their pockets. It was obvious the perpetrators were not interested in general property items. Thompson stated "that's not what we came for" and demanded to know "where is it at?"

The one carrying a duffel bag led Thompson to the basement and on their return asked for the combination to the safe. The duffel-bag carrier identified Bender as the owner of the safe, and Thompson proceeded to escort him to the basement, but a scuffle ensued. Bender yelled to another occupant, who had remained on the second story, to call the police. During the struggle the third intruder shot Bender in the leg. All three of the intruders left immediately through the back door.

Neither Thompson nor the third perpetrator, Albert Butler, had ever been to Bender's residence before. Pena made no attempt to contact Bender to finalize the $700 purchase that had been negotiated or for any other reason after the incident. The other

purchaser who had been to Bender's basement residence did try to contact Bender after the incident. To the extent anyone was able to describe the duffel-bag carrier, there was general agreement that he was of the same race as Pena, fairly good sized, wore dark clothes, and his face was covered. There was no positive identification of Pena as one of the intruders by the victims. Thompson and Pena were tried together.

At the close of the State's evidence, Pena moved for a judgment of acquittal on the grounds that there was a lack of sufficient evidence to establish that he was a[t] the scene of the break-in or in any way connected with it. The motion was denied, and the jury convicted Pena of all charges.

*Id.* at *1–2.

## III. Standard of Review.

Generally, we review PCR proceedings for correction of errors at law. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). "However, when the applicant asserts claims of constitutional nature, our review is de novo." *Id.* Thus, we review claims of ineffective assistance—which have their basis in the Sixth Amendment—de novo. *State v. Oetken*, 613 N.W.2d 679, 683 (Iowa 2000). That being said, we give weight to the PCR court's findings concerning witness credibility. *Ledezma*, 626 N.W.2d at 141.

## IV. Discussion.

To prevail on his claims of ineffective assistance, Pena "must satisfy the *Strickland* test by showing '(1) counsel failed to perform an essential duty; and (2) prejudice resulted.'" *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under the first prong, we presume the attorney performed his or her duties competently and "[w]e do not find such a breach by second-guessing or making hindsight evaluations." *Id.* In determining whether an essential duty was breached, "we measure . . . counsel's

performance 'objectively by determining whether [it] was reasonable, under prevailing professional norms, considering all the circumstances.'" *Id.* (alteration in original) (quoting *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010)). Under the second prong, Pena must prove by a preponderance of the evidence "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ledezma*, 626 N.W.2d at 143 (citation omitted). "In determining whether this standard has been met, we must consider the totality of the evidence, what factual findings would have been affected by counsel's errors, and whether the effect was pervasive or isolated and trivial." *Clay*, 824 N.W.2d at 496 (citation omitted). "Improvident trial strategy, miscalculated tactics, and mistakes in judgment do not necessarily amount to ineffective assistance of counsel." *State v. McKettrick*, 480 N.W.2d 52, 55 (Iowa 1992).

## A. Trial Counsel.

***Right to Testify.*** Pena alleges trial counsel failed to inform him of his right to testify or to advise him he should do so. He claims he was prejudiced because his testimony was the only evidence that he was at home the night of the incident.

At the PCR hearing, Pena testified that though he remembered telling the district court he was not going to be testifying as part of his and the trial attorney's "strategies regarding the case," the statement was false. According to Pena, they "never even discussed the strategies. She just did what she wanted." He also claimed his trial attorney never gave him any advice about whether he should testify and that, in fact, at the time of his trial, he did not understand what the word

"testify" meant. In contrast, at the PCR hearing, Pena's trial attorney testified that her "general rule" about whether her criminal clients testify in their own defense is that "it's their decision." When asked what she considers before advising defendants whether she thinks it is in their best interest to testify, she responded:

> Well, I look at the background. I look at whether or not they've been involved with the criminal justice system or they have a record, if you will. I look at whether or not they can testify in a believable manner, look at their demeanor. I look at the State's case and make some judgment calls on whether or not it's even necessary for the testimony if the State has not really made a plausible case in the first place.

Specifically regarding Pena's case, she testified:

> Mr. Pena did not have a criminal record. That was very much to his credit. His problem was his involvement with the victim in this case, Nikolas Bender. I told him the choice was his; however, if he had taken the stand, he would have had to admit such things as he had been involved in drug transactions with Mr. Bender and that he, in fact, was involved with making arrangements for a drug deal the night of the incident, and I advised him that could work in a negative way toward the jury seeing him as an honest, credible person. That was the worst thing.

Pena has not established that his trial attorney breached an essential duty by failing to inform him of his right to testify. While we are generally skeptical of a PCR applicant's self-serving statements regarding trial, *see Kirchner v. State*, 756 N.W.2d 202, 206 (Iowa 2008), we are even more so when those statements are contradicted by a record made contemporaneously at the time of trial. Here, the following exchange between trial counsel and Pena took place during trial:

> Q. Your Honor. I have had the same conversation with my client. He understands he has the absolute right to take the stand and testify on his own behalf. He also understands he has the absolute right to have evidence presented to the Court. I will ask him to confirm that with the Court. You understand that you have the right to take the stand if you want to? A. Yes.

Q. You have a right to have evidence presented on your behalf? A. Yes.

Q. We also talked about the fact that the jury's not to hold that against him if he doesn't take the stand. You understand that, don't you? A. Yes, ma'am.

Q. And after discussing our strategies regarding this case, it is my understanding that my client does not want to take the stand; is that correct? A. Yes.

Q. Speak up. A. Yes.

. . . .

Q. Is it your decision not to take the stand? A. Yeah.

Q. Let me put it another way. Is it your decision not to testify in this case? A. Yeah.

Q. Yes? A. Yes.

Insofar as Pena claims trial counsel breached an essential duty by not advising him he *should* testify, counsel has no such duty. Counsel must consult with the criminal defendant about his or her decision, but "whether to testify in his or her own behalf" is a "decision[] ultimately to be made by a competent client." ABA Standards for Criminal Justice: Control and Direction of the Case 4-5.2(b)(vi) (4th ed. 2015); *see also Ledezma*, 626 N.W.2d at 146 ("The decision whether or not to testify belongs to the defendant, and the role of counsel is to provide advice to enable a defendant to make the decision."). "Generally, the advice provided by counsel is a matter of trial strategy and will not support a claim of ineffective assistance absent exceptional circumstances." *Ledezma*, 626 N.W.2d at 147. Here, where trial counsel considered and indicated both the positives and negatives associated with Pena testifying, we will not use hindsight to second guess the strategic decision.

Pena has not established that trial counsel breached an essential duty regarding his right to testify in his own defense.

***Investigation and Preparation.*** Pena maintains trial counsel breached an essential duty by failing to properly investigate and prepare for the case. Specifically, Pena claims his trial counsel failed to investigate two witnesses who could provide an alibi for him; failed to investigate a potential getaway car, which was not associated with Pena; failed to hire an expert to compare shoes Pena owned with a shoeprint found at the site of the incident; and failed to investigate potentially exculpatory evidence she learned of after trial.

We agree with Pena that counsel has a duty "to conduct reasonable investigation or make reasonable decisions that make a particular investigation unnecessary." *Id.* at 145. However, Pena has not established prejudice because by the time of the PCR hearing, he had taken no further steps to establish that any of the evidence actually existed or was exculpatory. Neither of the two witnesses Pena named—persons he was living with at the time of the incident—testified at the PCR hearing. While he testified they could have provided an alibi, we have only Pena's statements to support the claim. *See, e.g.*, *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) ("Claims of uncalled witnesses are disfavored, especially if the claim is unsupported by evidence indicating the witnesses's willingness to testify and the substance of the proposed testimony."). Similarly, while it is unclear to us how testing Pena's shoes against the shoeprint could be exculpatory—the print was never tied to Pena at trial—he took no action to do so before the PCR hearing. And Pena has no evidence to provide regarding, as he refers to it, the "potentially exculpatory evidence" of the "gray sedan" that acted "as a potential getaway car." *See Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994)

("When complaining about the adequacy of an attorney's representation, it is not enough to simply claim that counsel should have done a better job.").

In contrast to Pena's statement that his trial counsel failed to investigate the potentially exculpatory evidence she learned after trial, trial counsel filed a motion to delay sentencing, claiming she was "conferring with the attorney of an interested party to this case who may have some material evidence favorable to Mr. Pena." At the PCR hearing, she testified that after Pena's conviction, she learned of a rumor regarding something one of his co-defendants had allegedly told a cellmate in prison about a possibly different third actor. Although she investigated the rumor, she was "never able to substantiate that."

Even if we assume counsel failed to investigate, Pena has not established that the investigations would have turned up any exculpatory evidence. Without more, we cannot say there is a reasonable probability the outcome of Pena's trial would have been different; this claim fails.

***Prior Statements about Robberies.*** During direct examination by the State, Jose Anaya—who lived with his brother Ricky and Bender in the residence where the robbery took place—testified as follows:

> Q. Okay. Now, tell us about the occasion that Derrick [Pena] had been over to the house before January 17th. A. He came in, Nik [Bender] met him at the back door, they went in the basement, hung out. Then as he left, he turned, looked at my brother [Ricky] and was like you guys got to be careful, in this neck of the woods people get robbed every day.

Similarly, Brooke Heisterkamp—who was the girlfriend of Ricky and visiting on the day Pena came to the house "two to four weeks" before January 17—testified Pena "walked up the steps and he kind of waved in. He was directing his comments

towards Ricky and he said, you have a nice house, he said you need to be careful in these neighborhoods when summertime comes around because that's when people rob in this area." Pena maintains these statements are not relevant or, alternatively, are relevant but inadmissible because their probative value is substantially outweighed by the danger of unfair prejudice; he claims trial counsel breached an essential duty when she failed to object to their admission.

Evidence is relevant when "[i]t has any tendency to make a fact more or less probable than it would be without the evidence; and [t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. "The test is 'whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if he knew of the proffered evidence.'" *State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988) (alteration in original) (citation omitted). The State urges us to find the evidence was relevant because the statements could be viewed as establishing Pena's intent to commit the robbery. The State maintains Pena may have made the statement in an attempt to misdirect the victims from identifying him in the event of the future robbery, arguing Pena hoped "to plant in their minds the idea that robberies are such regular events in their neighborhood that, should one occur, they could chalk it up to a random act." We are persuaded by the State's argument and find that Pena's prior statement about robberies was relevant to the underlying proceedings.

Next, we employ a two-part test to decide whether the evidence should be excluded under Iowa Rule of Evidence 5.403. *See State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013). Under the first prong, we consider the probative value of

the evidence. *Id.* Under the second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the jury. *Id.* In a case involving an alleged robbery between a drug-dealing victim and a drug-purchasing defendant, much of the evidence will be at least somewhat prejudicial; however, "[e]xclusion is required only when evidence is *unfairly* prejudicial [in a way that] substantially outweighs its probative value." *Id.* (alteration in original) (citation omitted).

Pena maintains the statements "carried a high risk of unfair prejudice," while at the same time arguing that they had nothing to do with the actual robbery because "it is highly unlikely a perpetrator of a crime would publish his intention to commit a crime to the future victims of that crime." Pena cannot have it both ways. If, as he argues, Pena's warning about robberies in the area makes it unlikely he was part of the robbery, there can be no unfair prejudice. Additionally, a statement about crime in the area is not the type of evidence that "appeals to jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case." *State v. Rodriguez*, 636 N.W.2d 234, 240 (Iowa 2001) (alteration in original) (citation omitted); *contra Huston*, 825 N.W.2d at 537–38 (determining a "founded child abuse report" from the Iowa Department of Human Services was unfairly prejudicial as it was "irrelevant to any issue for the jury to decide" and there was a "real danger the jury will be unfairly influenced by that agency finding, which gives the 'imprimatur' of a purportedly unbiased state agency on a conclusion" the defendant was guilty of child abuse).

Because the evidence of Pena's statements was relevant to the underlying proceeding and the risk of unfair prejudice was low, the district court would have overruled any objection made by Pena's trial counsel. Thus, trial counsel did not breach an essential duty by not objecting to Anaya's and Heisterkamp's testimony. *See State v. Lopez*, 872 N.W.2d 159, 169 (Iowa 2015) ("Counsel does not fail to perform an essential duty by failing to raise a meritless objection."). This claim fails.

***Plea Options.*** Pena claims trial counsel breached an essential duty when she "failed to properly advise [him] regarding the plea offer and the risk of going to trial." Pena relies on his own testimony whereby he claimed his trial counsel "just said she could win at trial, so the plea was out the window with me when she told me she could win." But Pena's testimony on the subject is not credible. Pena's trial counsel testified—credibly, according to the PCR court—that she explained his options and the benefits of the plea agreement. She also "remember[ed] telling Mr. Pena that [she] couldn't guarantee the outcome of a case. So much of the State's evidence was circumstantial, but circumstantial evidence is nevertheless evidence." She testified she had made Pena aware that the State's evidence was enough to convict him, and she even set up a meeting with herself, Pena, and the county attorney "so that he would know in detail what the State would present at trial."

The county attorney was also called to testify at the PCR hearing; she testified she remembered having "several conversations in [her] office [with trial counsel] about whether or not [she] would come off that initial plea offer. And by

virtue of that, [she] actually did a little bit later on in the case." Part of the reason Pena received the offer he did was because trial counsel spoke with the county attorney about Pena's "lack of criminal history and how harsh the penalties were." The county attorney stated that even after she made her presentation of her case and her offer to Pena

> it was very apparent to [the county attorney] that [trial counsel] asking for the conference did not have the impact on Mr. Pena that she hoped it would.
> . . . .
> [Trial counsel] talked to her later on, and he was not interested in the offer at all. And [trial counsel] actually was very upset about that and she had expressed that he just wasn't showing any interest in it at all.

Additionally, Pena's testimony at the PCR hearing lacked credibility. He testified he discussed the plea agreement with trial counsel only "very brief[ly]" and only the day before trial. He agreed he met with the county attorney and trial counsel at the courthouse but repeatedly maintained that had also taken place the day before trial. Pena's testimony changed once he was reminded that his trial started on a Monday morning, as he agreed that the meeting would not have occurred in the courthouse on a Sunday evening.

Because there is no credible evidence counsel breached an essential duty by failing to properly advise Pena regarding the plea offer and the risk of going to trial, this claim fails.

**Batson Challenge.** Pena maintains trial counsel breached an essential duty by failing to raise a *Batson* challenge when the prosecuting attorney struck a minority potential juror.

In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prevents a prosecutor from using peremptory strikes to challenge potential jurors "solely on account of their race." 476 U.S. at 89.

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*State v. Mootz*, 808 N.W.2d 207, 215 (Iowa 2012).

Based on our review of the record, this claim is a nonstarter; a *Batson* challenge—though not initially termed as such—was raised by trial counsel for Pena's co-defendant and then joined by Pena's trial counsel. Although voir dire was generally unreported, during the process of striking potential jurors, the court went on the record with both defense attorneys and the prosecution and made the following record:

> THE COURT: We are out of the presence of the members of the jury panel at this time. The lawyers have been passing the list of potential jurors back and forth exercising strikes and counsel have asked to make a record on this matter. And so I am going to—I think that technically [co-defendant's counsel] asked about this, so you may go first.
>
> CO-DEFENDANT'S COUNSEL: Thank you. Your Honor. The record should reflect that both [co-defendant] and Derrick Pena are African American. There are as I understand it two African American potential jurors, a [D.C.] and [X.M]. I had struck [D.C.] and the reason had nothing to do with the color of her skin, but rather with the fact that it appears she has a very close association to a Davenport police officer and through that relationship a close personal relationship to many Davenport police officers, and this case, of course, was being investigated by the Davenport Police Department. I do note that [the prosecuting attorney] struck [X.M.]

and I don't recall any discussion that would provide a race-neutral reason for her to have made that strike, so I did challenge the strike.

THE COURT: Okay. [Prosecuting attorney]?

PROSECUTING ATTORNEY: Your Honor, my strike of [X.M.] is much like the strike that [co-defendant's counsel] exercised with respect to [D.C.]. [X.M.] is personally acquainted with [Pena's trial counsel]. They attend the same church together and [Pena's trial counsel] had noted that he will be coming into her Sunday school class. And the second basis for the strike, which is also the basis for another strike that I made, is [X.M.] was born in '93. He is young, only 18 years of age. And then the State also exercised a strike of [B.M.], who was born in '88, who is young. And I would have also struck [H.M.], but I believe [Pena's trial counsel] exercised that strike because she was born in '80 and she is a younger member of the jury. And as everybody is well familiar with me, particularly having tried a number of cases with me, I have a tendency to remove young people from the jury panel because of their life experience. But his strike is twofold because he does have a personal relationship with [Pena's trial counsel] and I'm worried that because of that relationship that he may be unduly influenced at such a young age, particularly recognizing that they do attend church and she'll be his Sunday school teacher.

THE COURT: [Co-defendant's counsel], any comments you wish to make in response to [the prosecuting attorney's] statements?

CO-DEFENDANT'S COUNSEL: No, Your Honor.

THE COURT: [Pena's trial counsel], any comments or matters you wish to place upon the record?

PENA'S TRIAL COUNSEL: Well, of course, I would join [co-defendant's counsel] in his motion here, but, on the other hand, I tried to make it very clear that I did know [X.M.]. And [prosecuting attorney] is correct, he does attend my church and he will be a member of a Sunday school class that I teach. He has not been a member of that class up to this point.

THE COURT: Anything else?

. . . .

PENA'S TRIAL COUNSEL: I would like to go ahead on the record just because of my past civil rights experience and say I do not strike people because of their youth.

THE COURT: The Court has considered the matters that are asserted by [co-defendant's counsel] and has also considered the responses made to those assertions by [the prosecuting attorney] and the comments of [Pena's trial counsel] as well. The Court believes that the State has satisfactorily articulated a rationale other than race for the strikes that were made in this case and the Court is noting but overruling the objection made by [co-defendant's counsel]. The Court was present in the courtroom and listening to the

responses made by the persons who are on our list at this time for possible choice as a juror, and I think that there is merit to the matter as raised by [co-defendant's counsel], but I think there also was merit in the response made by [the prosecuting attorney], so that being the case, the objection, then, is overruled to those two particular strikes. Anything else we need to do?

> PROSECUTING ATTORNEY: No, Your Honor.

> CO-DEFENDANT'S COUNSEL: The name of the challenge slipped my mind as I was making it, but that, as I am sure everyone is aware, was meant to be a *Batson* challenge.

> PROSECUTING ATTORNEY: Yeah.

> THE COURT: So noted. Okay. Thank you.

Because trial counsel did join in a *Batson* challenge, there has been no breach of an essential duty and this claim fails.

## B. Direct-Appeal Counsel.

***Motion for New Trial.*** Pena maintains his appellate counsel provided ineffective assistance by failing to properly challenge on direct appeal[2] the district court's denial of his motion for new trial (based on the weight of the evidence being contrary to the jury's verdicts).

The appellate court reviews the district court's ruling on a motion for new trial for an abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). We do not consider the underlying question of whether the verdict is against the weight of the evidence. *Id.* The district court is to "exercise its discretion carefully

---

[2] We note that appellate counsel technically did raise the issue of whether the district court abused its discretion in denying his motion for new trial. However, it appears counsel failed to raise the issue with sufficient specific argument for our court to rule on it. The following is from the ruling on Pena's direct appeal:

> Pena moved for a new trial where the ground for relief is defined as where the verdict is "contrary to the weight of the evidence." *See State v. Ellis,* 578 N.W.2d 655, 659 (Iowa 1998). Pena gets to benefit from the possibly less-stringent rule on the motion for new trial, but Pena does not direct the court to contrary evidence. His claim is a lack or deficiency of evidence connecting him to the crimes.

*Pena*, 2013 WL 5745608, at *2.

and sparingly when deciding motions for new trial based on the ground that the verdict or conviction is contrary to the weight of the evidence." *Id.* at 205. Even if the district court might have been inclined to render a different verdict than the jury, it must uphold that verdict in the face of mere doubts that it is correct. *Id.* at 203.

We cannot say appellate counsel breached an essential duty by not properly challenging the district court's ruling on a motion for new trial. "Given the broad discretion that a trial court enjoys in ruling" on such motions, "we do not believe it was ineffective assistance of counsel not to include the denial of that motion as an issue on direct appeal." *Stringer v. State*, 522 N.W.2d 797, 799 (Iowa 1994). "Appellate counsel must be discerning in the determination of those issues to be presented on appeal with an idea of presenting the most effective argument for the client." *Id.* "Selecting assignments to assert as grounds for reversal is a professional judgment call we are reluctant to second-guess." *Osborn v. State*, 573 N.W.2d 917, 922 (Iowa 1998).

> [M]ost experienced appellate lawyers or judges will attest it is a tactical blunder, often devastating to an appellant, to assign every conceivable complaint. Highly competent appellate lawyers generally assign only the strongest points and rely on them for reversal. . . . Hindsight [may show the judgment call] was wrong. But this is a far cry from qualifying as ineffective representation.

*Id.* at 922–23 (alteration in original) (quoting *Cuevas v. State*, 415 N.W.2d 630, 633 (Iowa 1987)). "For judges to second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy." *See Jones v. Barnes*, 463 U.S. 745, 754 (1983).

Because Pena has not established that appellate counsel had a duty to argue this specific error, this claims fails. *See Osborn*, 573 N.W.2d at 922 (refusing to find appellate counsel breached an essential duty because applicant was unable to overcome strong presumption of counsel's competence in choosing which errors to raise on appeal).

## V. Conclusion.

Because Pena has failed to establish that either his trial counsel or his appellate counsel provided ineffective assistance, we affirm.

**AFFIRMED.**